970 So.2d 564 (2007)
Judy RIDEAU and Kerry Bardell
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al.
No. 2006 CA 0894.
Court of Appeal of Louisiana, First Circuit.
August 29, 2007.
Rehearing Denied October 22, 2007.
*569 Walter Landry Smith, Baton Rouge, for Plaintiffs-Appellees/Appellants Judy Rideau and Kerry Bardell.
Matthew W. Pryor, Timothy E. Pujol, Brittany A. Keaton, Pujol & Pryor, Prairieville, for Defendants-Appellants/Appellees State Farm Mutual Automobile Ins. Co. and Ward's Trucking Service, Inc.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
PARRO, J.
Both the plaintiffs and defendants in this case appeal a judgment based on a jury verdict arising out of an accident in which a child was killed when a truck hit her as she tried to cross a roadway. The plaintiffs and defendants challenge certain evidentiary rulings and the jury's allocation of fault; the defendants also appeal the assessment of court costs and the amount of damages. We amend in part and affirm as amended.

FACTUAL AND PROCEDURAL BACKGROUND
Right at sunset on January 31, 2003, ten-year-old Bria Bardell tried to cross the two-lane road[1] in front of her house to get to the church parking lot across the road, where a group of children were preparing to board a school bus for a skating outing. Bria's mother was on her way to work and was running late. Before she left for work, she stopped and asked a church acquaintance, who was with his grandson in front of the church, to help Bria cross the road safely. He watched Bria as she ran down the long driveway from her house to the roadside, where she stopped and looked both ways. There was a long gap in traffic in both directions when Bria paused at the end of her driveway and looked. She then turned to her right and walked southbound about 20-25 feet on the shoulder of the road, apparently intending to line up directly opposite the church driveway before crossing. At that point, although she looked to her right again, she did not look to her left before stepping onto the roadway. The church acquaintance who was watching Bria saw a truck approaching, but even though he shouted and waved his arms, he was unable to get Bria's attention to warn her. When she stepped onto the roadway, she was hit by a southbound mail delivery truck; she died shortly afterward of her injuries. The truck was driven by Simuel Ward, owned by Ward's Trucking Service, Inc. (Ward's),[2] and insured by State Farm Mutual *570 Automobile Insurance Company (State Farm).[3]
Bria's parents, Judy Rideau and Kerry Bardell (collectively, the plaintiffs), filed suit against Ward's and State Farm (collectively, the defendants), alleging that Mr. Ward was acting within the scope of his employment with Ward's when the accident occurred and that his negligence was the sole cause of Bria's injuries and death. The defendants answered, claiming the accident was caused exclusively by Bria's negligence or, in the alternative, by her comparative fault for failing to take proper precautions before entering the street. They also averred that the accident was caused and/or contributed to by the negligence and/or strict liability of other unnamed third parties.
After a trial, the jury found that Ward's was vicariously liable through its employee for 60 percent of the fault and that Bria and her mother, Ms. Rideau, were each 20 percent at fault. They awarded general damages in the amount of $840,000 to Ms. Rideau and $360,000 to Mr. Bardell, as well as medical expenses of $1,337.52 and funeral expenses in the amount of $10,804.55. The trial court had a separate hearing concerning special items of costs. After that hearing and after applying the allocations of fault, the judgment ordered the defendants to pay Ms. Rideau $504,000; to pay Mr. Bardell $216,000;[4] to pay them, in solido, $7,285.24; to pay them, in solido, all court costs; and to pay them, in solido, special items of costs in the amount of $4,612.38, together with legal interest from date of judicial demand on all awards.
The plaintiffs filed a motion for judgment notwithstanding the verdict, asking the court to strike either the 20 percent of fault allocated to Bria or the 20 percent of fault allocated to her mother, and to proportionally re-allocate fault to either Bria or her mother. The defendants also filed a motion for judgment notwithstanding the verdict, or alternatively, for a new trial, seeking a reversal of the jury verdict on both liability and damages. The trial court denied both sides' motions, and both plaintiffs and defendants then appealed.
The plaintiffs contend it was legal error to assign fault to Bria's mother, because she had no duty to accompany her child across the road, when the evidence showed Bria was an intelligent and mature child who had been instructed in how to cross and had crossed this road on her own countless times at this location. They also contend that if there were such a duty, Ms. Rideau satisfied it by asking a church acquaintance, John McCrory, to help Bria cross the road safely.[5] They ask for a re-allocation of fault, striking either the fault attributed to Ms. Rideau or the fault attributed to Briaor alternatively, a finding that neither of them were at fault. Finally, they contend the court erred in overruling objections to certain testimony provided by the investigating officer, who did not see the accident and had no training in accident reconstruction.
The defendants contend Mr. Ward could not and did not anticipate that Bria would turn suddenly and start across the road *571 directly in his path. They argue that the law absolves a driver of liability when faced with sudden and unforeseeable actions by a pedestrian; therefore, it was error to assign any fault to Mr. Ward. In the alternative, should some degree of fault be assigned to him, they argue that it should be considerably less than 60 percent. They claim that since Bria was an exceptionally mature child, she should not be given the benefit of the diminished standard of behavior sometimes expected from a child and should bear a greater degree of fault. They also contend the jury could have found that both Bria and her mother were independently negligentBria, for failing to look to the left before stepping out onto the roadway, and Ms. Rideau, for failing to take the few extra minutes to ensure that her child crossed the road safely. The defendants also claim that the trial court erred in admitting certain evidence from the Louisiana Driver's Guide, that the jury abused its discretion in awarding over $1 million dollars to Bria's parents, and that the court abused its discretion in assessing all court costs to the defendants.

STANDARD OF REVIEW
The appellate court's review of factual findings is governed by the manifest error/clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding as to issues of material fact, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735. However, the above approach need not be considered when a jury has made some factual findings favorable to each party, and when the legal error affected only one of the findings, but does not interdict the entire fact-finding process. The appellate court should proceed to evaluate each jury finding pertinent to liability in order to determine the applicability of the manifest error rule to each. Picou v. Ferrara, 483 So.2d 915, 918 (La. 1986). If only one of the jury's factual findings is tainted by the application of incorrect principles of law that are prejudicial, the appellate court's de novo review is limited to the jury finding so affected. Id. at 918-20; see also Buckbee v. Aweco, Inc., 614 So.2d 1233, 1236 n. 7 (La.1993); Boudreaux v. Farmer, 604 So.2d 641, 649 n. 7 (La.App. 1st Cir.), writs denied, 605 So.2d 1373 and 1374 (La.1992).

ANALYSIS
Evidentiary Rulings
All relevant evidence is admissible, except as otherwise provided by law. LSA-C.E. art. 402. Relevant evidence is *572 evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. LSA-C.E. art. 401. Generally, a witness not testifying as an expert may not give testimony in the form of opinions or inferences. This rule is subject to the limited exception of Louisiana Code of Evidence article 701, which provides that a lay witness may provide testimony in the form of opinions or inferences where those opinions or inferences are: (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. Louisiana Land and Exploration Co. v. Verdin, 95-2579 (La.App. 1st Cir.9/27/96), 681 So.2d 63, 66, writ denied, 96-2629 (La.12/13/96), 692 So.2d 1067, cert. denied, 520 U.S. 1212, 117 S.Ct. 1696, 137 L.Ed.2d 822 (1997). Thus, a lay witness may give opinion testimony based on his training, investigation, perception of the scene, and observation of physical evidence. Temple v. State ex rel. Dep't of Transp. and Dev., 02-1977 (La.App. 1st Cir.6/27/03), 858 So.2d 569, 577, writ denied, 03-2116 (La.11/7/03), 857 So.2d 501. The trial court is granted broad discretion in its evidentiary rulings, and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. Schuyten v. Superior Systems, Inc., 05-2358 (La.App. 1st Cir.12/28/06), 952 So.2d 98, 106; Smith v. Smith, 04-2168 (La.App. 1st Cir.9/28/05), 923 So.2d 732, 742.
Addressing first the evidentiary issues raised by the parties, the plaintiffs assert the trial court abused its discretion in allowing the jury to hear certain testimony from Officer Chris Wayne, the Zachary police officer who investigated the accident. They argue that he did not see the accident and had no training in accident reconstruction. Therefore, certain statements made by him, including the observations that no citation was issued to Mr. Ward and that he concluded from his investigation that Mr. Ward was not speeding or driving improperly, were inadmissible lay opinions on the ultimate issues of fault.
After a thorough examination of the trial transcript, we disagree with this contention. Officer Wayne's statements were merely reports of facts within his personal knowledge, namely, that he did not ticket Mr. Ward and that no evidence at the scene, such as skid marks, indicated Mr. Ward had violated any traffic rules by speeding or unsafe driving. The trial court was quite specific in allowing Officer Wayne to testify only to evidence and conditions he personally had found or not found at the scene when he investigated the accident, and Officer Wayne, himself, was very circumspect about providing factual information only. Moreover, these statements were consistent with trial testimony from eye-witnesses, including Mr. McCrory, who stated, "my estimate would be he wasn't going any faster than the speed limit. . . ." Therefore, the trial court did not abuse its discretion in allowing these statements.
The defendants claim the trial court erred in allowing the Louisiana Driver's Guide for Class D and E licenses to be admitted to establish a motorist's standard of care when approaching a pedestrian, because, although its principles may be applicable generally, they were not applicable under the facts of this case. For instance, the guide indicates that a motorist has the highest duty to a pedestrian on the side of the road and should anticipate the possibility that the pedestrian will enter the road. The defendants argue that this statement fails to take into consideration the rural nature of this highway, the lack of an intersection or crosswalk, the *573 dark clothing worn by Bria, and her own duty to be careful. However, the principles stated in the Louisiana Driver's Guide are consistent with Louisiana law concerning the duty of a motorist vis-à-vis a pedestrian. As stated in Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 406 (La.1978):
The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of care than that required of pedestrians is imposed upon the motorist commensurate with the hazards his conduct inflicts upon the public safety.
See also Blair v. Tynes, 621 So.2d 591, 596-97 (La.1993); Turner v. New Orleans Public Serv., Inc., 476 So.2d 800 (La.1985). These general principles of law must always be applied to the particular factual circumstances in each case. Moreover, the court instructed the jury concerning the correlative duties of a pedestrian, as described in LSA-R.S. 32:212(B) and LSA-R.S. 32:213, namely, that a pedestrian should not suddenly leave a place of safety and walk into the path of a vehicle that is so close that it is impossible for the driver to yield and that every pedestrian crossing a roadway at a point not within a marked crosswalk or within an unmarked crosswalk at an intersection must yield the right of way to all vehicles on the roadway. Therefore, we find no abuse of discretion in the court's admission of the statements from the Louisiana Driver's Guide.
JNOV, Negligence, and Allocation of Fault
Article 1811(F) of the Louisiana Code of Civil Procedure authorizes a trial court to grant a judgment notwithstanding the verdict (JNOV) on either the issue of liability or damages or both. A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on that issue. McLin v. Breaux, 05-1911 (La.App. 1st Cir.11/3/06), 950 So.2d 711, 714, writ denied, 06-2822 (La.1/26/07), 948 So.2d 177; Broussard v. Stack, 95-2508 (La.App. 1st Cir.9/27/96), 680 So.2d 771, 779-80. On issues where virtually no factual dispute exists and no credibility determinations by the fact finder are required, legal questions are within the province of the trial court to decide by entering a JNOV. Id.
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of Louisiana Civil Code article 2315. For liability for damages to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause in fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damage element). Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 275-76. Duty is a question of law. The inquiry is whether a plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his or her claim. Bowman v. City of Baton Rouge/Parish of East Baton Rouge, 02-1376 (La.App. 1st Cir.5/9/03), 849 So.2d 622, 627, writ denied, 03-1579 (La.10/3/03), *574 855 So.2d 315. Breach of duty, cause in fact, and actual damages are all factual issues. Snearl v. Mercer, 99-1738 (La. App. 1st Cir.2/16/01), 780 So.2d 563, 574, writs denied, 01-1319 and 01-1320 (La.6/22/01), 794 So.2d 800 and 801. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Whether the defendant's conduct was a substantial factor in bringing about the harm, and thus, a cause in fact of the injuries, is a factual question to be determined by the fact finder. Bonin v. Ferrellgas, Inc., 03-3024 (La.7/2/04), 877 So.2d 89, 94; Manno v. Gutierrez, 05-0476 (La. App. 1st Cir.3/29/06), 934 So.2d 112, 117.
With reference to the allocation of fault when liability is shared by two or more defendants, Louisiana Civil Code article 2323(A) provides, in pertinent part, as follows:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined. . . . If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 611. The finding of percentages of fault pursuant to the comparative fault article is a factual determination. Id. at 610. If the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the allocation, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Id. at 611; see also Dennis v. The Finish Line, Inc., 99-1413, 99-1414 (La. App. 1st Cir.12/22/00), 781 So.2d 12, 16 n. 12, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319.
The plaintiffs' first three assignments of error present the question of whether the trial court legally erred in not granting their motion seeking a JNOV and striking either the fault attributed to Ms. Rideau or the fault attributed to Bria. The gist of their argument is that it is logically inconsistent to impose a duty on both Bria and her mother. If the jury believed the evidence established that Bria was a mature and intelligent child who was competent to cross this road on her own, had crossed by herself at the same location every school day for the previous six months, and knew how to protect herself, then the jury must have found that she was aware of the need for caution. Therefore, it was Bria's duty and responsibility to take the necessary steps to ensure her own safety when crossing the road. The plaintiffs further contend that as a legal matter, if Bria knew about the potential danger in crossing the road at that location and knew the proper measures to protect herself, then her mother, Ms. Rideau, had no duty to supervise her every time she needed to cross the road. Accordingly, Ms. Rideau could not be at fault for failing *575 to help Bria cross the road on this occasion, and the jury's imposition of fault on Ms. Rideau is legal error that should have been reversed by the trial court.
In the alternative, the plaintiffs argue that if the jury believed that Bria did not realize the danger involved or did not know how to protect herself, then Ms. Rideau had the duty to supervise Bria as she tried to cross the road. In that circumstance, she was a child under the age of discernment and no fault could be attributed to Bria; only her mother could be negligent for failing to properly supervise her. Therefore, the plaintiffs urge that it was legal error to impose a duty on both Bria and her mother under these facts.
Minors who are incapable of discernment are immune from being found legally at fault. However, this freedom from fault is limited to the minor of tender age who is so incapable of discernment as to also be incapable of being legally at fault. See Turner v. Bucher, 308 So.2d 270, 276 n. 14 (La.1975) (six-year-old child); Fromenthal v. Clark, 442 So.2d 608, 609 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1242 (La.1984) (two-year-old child). The contributory or comparative fault of a child is measured not by the standard of self-care expected of an adult, but rather the self-care expected of a child of his age, intelligence, and experience under the particular circumstances presented to him. See Howard v. Allstate Ins. Co., 520 So.2d 715 (La.1988). In determining whether a child is legally at fault, due regard must be given to the child's age, maturity, intelligence, and knowledge, generally, and as to the particular situation involved, as well as to all the facts and the circumstances of the case, including the particular risk that produced the injury. Gremillion v. State Farm Mut. Ins. Co., 331 So.2d 130, 132-33 (La.App. 3rd Cir.1976). In the Gremillion case, a ten-year-old boy who hit his friend while swinging a golf club was found not to understand the risks and potential consequences of his action. He was not advanced in maturity, knowledge, or intelligence, and had failed one grade in school. The evidence did not show that he had sufficient awareness to anticipate that another child might suddenly and without warning place himself in the path of his swing, since such knowledge of children's rash, impetuous, and careless acts is peculiar to adults. Id. at 133. In Killough v. Bituminous Cas. Corp., 28,329 (La.App. 2nd Cir.5/8/96), 674 So.2d 1091, 1098, a boy just two days shy of his tenth birthday was found legally at fault when his leg and foot were caught in the pump while he was playing on an oil well. He had attention deficit disorder and a learning disability, yet he testified that he knew that an oil well could hurt or kill him, and also admitted he had been warned by his mother to stay away from the wells. In Pritchard v. Safeco Ins. Co., 529 So.2d 449, 452 (La. App. 1st Cir.), writ denied, 532 So.2d 159 (La.1988), this court affirmed a trial court's dismissal of a negligent supervision claim against the parents of a twelve-year-old boy, in which the trial court had concluded that a negligent supervision theory applied only to younger children, and did not apply to a child who could be independently at fault.
After examining the record in this case, we agree with the plaintiffs that it was legal error for the trial court to deny their motion for a JNOV under these circumstances. The legal theory whereby fault is imposed on a parent due to the parent's negligent supervision of a child applies only when the child is not old enough to appreciate the danger and to take steps to avoid it. Only in such a case does the parent have a duty to supervise the child. If the child has reached the age of discernment, *576 where he or she knows of the danger in a particular situation or activity and also knows how to avoid that danger, then the parent has no duty to supervise that child in that situation or activity. The existence of a duty is a question of law. Therefore, it was incumbent upon the court to correct the jury's assignment of fault to both Bria and her mother by allocating it to one or the other. Having failed to do so, and because the allocation of fault to both was tainted by legal error, this court must evaluate the facts and circumstances with regard to Bria and Ms. Rideau de novo to determine whether Bria had reached the age of discernment and could have been independently at fault.
Bria was ten years old. Ms. Rideau testified that she was in the fifth grade at St. Isidore's, "was very, very bright," did well in school, and wanted to be a doctor. Shortly before her accident, Bria and a classmate had won the social studies competition and were preparing to go on to the district competition. After Bria's death, her classmate presented their project at the district competition, where it won first place; the project also placed at the state level. Bria loved to sing, dance, and write poetry. She took piano lessons, took tap and ballet lessons, and was learning how to play the clarinet for the school band. She was very outgoing and could communicate her thoughts verbally and in writing. Her mother said Bria "exhibited wisdom from her birth that was very unusual." Bria's church activities included membership in a youth group, performing liturgical dance, and singing solos. Her father confirmed that she was always energetic, creative, and happy. He said, "I guess sunshine is a good word for her." She was very inquisitive and would ask questions about things she was curious about. Mr. Bardell also said that she was a very caring child, always wanting to help others and sensitive to the needs of her family. She had demonstrated to both parents on various occasions that she knew how to cross a road safely. In fact, during the six months since starting fifth grade, Bria had crossed the road where the accident occurred on a daily basis during the school year to get off the school bus when it stopped across the road from her house. On the evening when the accident occurred, Bria indicated her awareness of the danger and her ability to protect herself by her actions when she reached the end of the driveway; she stopped and looked in both directions for traffic, thus indicating that she knew the risk of oncoming traffic and also knew how to avoid harm.
Under the particular facts and circumstances of this case, and keeping in mind Bria's age, maturity, intelligence, and knowledge of the proper ways to protect herself when crossing a road, we conclude that Bria could be and was independently at fault, as the jury found. For this reason, the negligent supervision claim against her mother was legally inapplicable, because Ms. Rideau had no duty to supervise Bria in this situation. Therefore, the allocation of fault to Ms. Rideau must be reversed, and this court must re-allocate the fault attributed to Ms. Rideau to Bria.[6]
Before completing the re-allocation of fault, however, we must address the defendants' claim that the jury's allocation of 60 percent of the fault to Mr. Ward was manifestly erroneous, and that either no fault or considerably less fault should *577 be attributed to him.[7] The jurisprudence of this state places a high degree of care upon a motorist who sees a child on or near the road and imposes upon him a duty to anticipate that the child, possessed of limited judgment, might be unable to appreciate impending danger, is likely to be inattentive, and might suddenly place herself in a position of peril. Buckley v. Exxon Corp., 390 So.2d 512, 514 (La.1980). Every driver is required to exercise due care to avoid colliding with any pedestrian upon any roadway, to give warning by sounding the horn when necessary, and to exercise proper precaution upon observing any child upon or near a highway. See LSA-R.S. 32:214; Weatherford v. Commercial Union Ins. Co., 93-0841 (La.App. 1st Cir.5/20/94), 637 So.2d 1208, 1210, aff'd, 94-1793 (La.2/20/95), 650 So.2d 763. The duty to exercise greater than ordinary care to avoid injury to a child becomes operative or exists in favor of the child when her presence is known or should have been known to the operator or driver of a motor vehicle under the existing facts of the particular case. The motorist, upon discovering the presence of children in his path of travel or in a position where they could become imperiled, is under a duty to exercise the highest degree of care to avoid injury to them. Each case must be adjudged on the facts peculiar to it. No one case is absolutely controlling of another, as few cases are identical factually. Id. In McFarland v. Industrial Helicopters, Inc., 502 So.2d 593, 596 (La.App. 3rd Cir.1987), the court premised the driver's fault on his failure to maintain a proper lookout, thus failing to see a two-year-old child standing beside the road in a position where he should have been seen by the driver. The truck driver testified that he was checking his rearview mirror to make sure his load was secure, and when he looked back at the roadway, "the little boy was right there." Though he swerved the truck to avoid hitting the child, the driver said he never saw him until just before the impact. Id. at 596.
Mr. Ward testified that he was driving south from Clinton and was nearing Zachary on a mail delivery route that he had been traveling about two to three times each week for three to four years. He was familiar with the area and knew it was primarily residential at the accident site. The speed limit was 55 miles per hour, and Mr. Ward at various times said he was driving about 40, 45, or 50 miles per hour, but consistently stated he was not exceeding the speed limit. The accident occurred about 5:45 p.m., and the sun had set. Mr. Ward stated at trial that it was much darker than normal. However, he admitted that in a taped statement four days after the accident, he had told an insurance adjuster that it was "half dark." He did not recall any artificial lighting being on at the time of the accident. He indicated that traffic was very heavy, but later acknowledged that although traffic was often heavy on Plank Road, it had let up and was not bad right at that time and place. Mr. Ward said Bria was wearing dark clothes, and he did not see her at all until she stepped out into his lane of travel about ten to twelve feet in front of his truck. He swerved hard to the left, but was unable to avoid hitting her. He estimated that she was in the middle of his lane of travel when he hit her. The truck's right front bumper hit the child and threw her onto the right shoulder of the road. His truck ended up parked on *578 the shoulder on the opposite side of the road. Mr. Ward said he did not slow down or honk the horn, and took no evasive action other than the last-second swerve to the left, because he did not see Bria before that time.
Photographs of the accident site show a flat, straight stretch of two-lane highway, marked with a yellow dashed line at the center and a white unbroken line at the edge of the road, beyond which there is a light-colored, flat, paved shoulder. Based on the computations of both the plaintiffs' expert, James Sobek, and the defendants' expert, Charles Prewitt, Mr. Ward had a completely unobstructed sight line and was about 700 feet away from Bria when she reached the end of her driveway and began walking on the shoulder.[8] Mr. Prewitt acknowledged that at 600 feet, Mr. Ward might have discerned that there was a pedestrian on the shoulder. And at 300 feet, Mr. Ward could probably tell that there was a pedestrian on the shoulder and could make out some of the details, such as her movements or a turn of the head. Mr. Prewitt also admitted that at 300 feet, going 55 miles per hour, "[Mr. Ward] could slow down and perhaps avoid impact or he could have swerved[;] he would've had enough time to do some swerving maneuver." Mr. Sobek estimated that Mr. Ward had at least ten seconds during which Bria was within his unobstructed sight line, which gave him plenty of time to discern her and avert the accident. Mr. Sobek said Mr. Ward should have been able to see Bria "[w]alking toward the road, apparently stopping at the side of the road, . . . looking left, looking right, and then walking along the side of the road and then stopping again and finally moving out." He opined that Mr. Ward "was not paying attention to the situation ahead of him for an extended period of time."
The police officer was dispatched to the scene at 5:42 p.m., so obviously the accident had occurred before that time. U.S. Naval Observatory data was in evidence and was used by both experts to determine that on January 31, 2003, sunset occurred at 5:40 p.m., and civil twilight, defined as the limit at which illumination is sufficient under good weather conditions for terrestrial objects to be clearly distinguished, lasted until 6:05 p.m. Although there was some cloud cover, there was no rain or fog when the accident occurred. Mr. McCrory testified that "it was pretty clear as far as visibility was concerned," and said he could see Bria as she left her house and began to walk down her long driveway toward the road. This put him at a distance of 777' from her, which included the length of her driveway and the width of the road to the point where he was standing in the church parking lot. Another eyewitness, Eric Hopkins, said that there was still enough light to see from his position on the porch of the church office. A neighbor, Mark Lanier, who was working with his cattle about 800' to 1000' from the accident site, stated that he did not see the accident, but when he looked up immediately after the accident, he could see people moving across the road, could tell how many there were, and could discern whether they were male or female. Debra Pierre, who had previously worked for the plaintiffs' attorney for one week prior to taking another job, was asked by him to observe the lighting conditions at the accident site exactly one year after the accident. When she took a satellite-radio-controlled clock to the site on January 31, 2004, at exactly 5:42 p.m., the sky was overcast with thick, dark clouds. Despite that, she observed *579 that "[t]here was still plenty of daylight to see." Visibility did not decrease until about 6:00 p.m., at which time it "was getting a little dark." Mr. Lanier testified that he was just leaving his driveway when Ms. Pierre was making her observations, and said there was still enough daylight at that time to see details on mailboxes "quite a ways" down the road. The experts for both sides concluded that the lighting was not a factor in the accident.
Based on our review of the evidence, we find there is a reasonable factual basis in the record for the jury's allocation of 60 percent of the fault to Mr. Ward. There was ample evidence from which the jury could have concluded that if Mr. Ward had been paying attention, he would easily have seen Bria walking along the paved shoulder of the road at some point between 700 feet and 300 feet before the point of impact. While he closed the distance between them, Mr. Ward had plenty of time to discern that a child was walking alone in a position of danger and to slow down, move to the left, and/or sound his horn.
Since we have found a reasonable factual basis exists for the jury's allocation of fault to Mr. Ward, we have reviewed the record in its entirety to determine whether or not the finding was clearly wrong. In doing so, we note that Bria and Mr. Ward were almost equally at fault in causing this accident. Bria should have taken that last look to the left before stepping onto the roadway, and Mr. Ward should have been paying attention to what was going on within his unobstructed sight line. Because of the greater risk to Bria from Mr. Ward's inattention and failure to act, as well as his greater responsibility as an adult and as an experienced, professional driver vis-à-vis a child pedestrian, he should bear the higher degree of fault. In addition, from his position high above the roadway in the cab of the truck, Mr. Ward had a better vantage point from which to estimate Bria's speed and the time in which he would reach her position. The risk created by his inattention or inadvertence was great, and he was in a superior position to avoid the accident. Therefore, our thorough review of the record leads us to conclude that the jury's allocation of 60 percent of the fault to Mr. Ward was not clearly wrong. Since we agree with the allocation of 60 percent of the fault to Mr. Ward, we will not adjust that allocation, but will now merely re-allocate the entire 20 percent of the fault attributed to Ms. Rideau to Bria, thereby resulting in an allocation of 40 percent of the fault to Bria. The judgment will be modified accordingly.
General Damages
Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. In reviewing an award of general damages, the court of appeal must determine whether the trier of fact has abused its much discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Dennis, 781 So.2d at 21.
*580 The jury in this case awarded $1.2 million in wrongful death damages,[9] $840,000 to Ms. Rideau and $360,000 to Mr. Bardell. While it is impossible to place a monetary value on the life of a child, our jurisprudential system has established that a monetary award is the appropriate remedy to one who has suffered the loss of a loved one as a result of the fault of another. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 833 (La.1991). The elements of damage for wrongful death are loss of love, affection, companionship, services, and support, as well as medical and funeral expenses. See Duplantis v. Danos, 95-0545 (La.App. 1st Cir.12/15/95), 664 So.2d 1383, 1391; Gibson v. State, Through Dep't of Transp. & Dev., 95-1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1006, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373 and 374. While the loss of a child is emotionally traumatic to the parents, such a loss does not include the elements of loss of services and support, since a child generally does not contribute to the family in providing these elements. Moreover, the companionship provided by a child is of a different nature than that provided by an adult, and in most cases, does not continue at the same level after the child reaches adulthood and establishes a home separate from the parents. Therefore, we agree with the defendants that this award was an abuse of the jury's discretion, and we must reduce the damage award to the highest or lowest point of an award within that discretion.
It is clear from the testimony that both parents loved Bria very much, and both were grief-stricken by this loss. However, although Mr. Bardell visited Bria regularly and contributed to her support throughout her life, she did not live with him or visit him in his home. On the other hand, Bria had lived with her mother since birth, and was her mother's only daughter. Ms. Rideau had organized her life around Bria's care and activities, and had a very close and loving relationship with her. Based on our comparisons with other cases in which damages have been awarded to parents for the wrongful death of a child, the highest awards within the jury's discretion would have been $575,000 to Ms. Rideau and $250,000 to Mr. Bardell. See Barton v. Hines, 04-0329 (La.App. 3rd Cir.10/6/04), 884 So.2d 1214, 1222, writ denied, 04-2751 (La.3/18/05), 896 So.2d 999 (award of $575,000 in wrongful death damages to single mother of epileptic son whom she found drowned in an oxidation pond); Dartlone v. Louisiana Power & Light Co., 33,597 (La.App. 2nd Cir.6/21/00), 763 So.2d 779 ($350,000 per parent for electrocution death of 17-year-old son who was an exemplary member of the community, when both parents sought therapy and medication for depression after the death); Courteaux v. State, ex rel. Dep't of Transp. & Dev., 99-0352 and 0353 (La. App. 4th Cir.9/22/99), 745 So.2d 91, writ denied, 99-3214 (La.1/28/00), 753 So.2d 834 ($275,000 to each parent of 17-year-old only child, who was killed in a head-on automobile collision); Hattori v. Peairs, 95-0144 (La.App. 1st Cir. 10/6/95), 662 So.2d 509, writ denied, 95-2677 (La.1/12/96), 666 So.2d 322 ($275,000 to each parent of 16-year-old Japanese exchange student shot by homeowner believing the student was a danger to his family); Rebstock v. Hospital Svce Dist. No. 1, 01-0659 (La.App. 5th Cir.11/27/01), 800 So.2d 435, 439, writ denied, 02-0077 (La.3/15/02), 811 So.2d 914 ($366,250 to *581 mother and $237,800 to father of two-day-old child, reduced to a total of $500,000 due to medical malpractice cap on general damages); Anderson, 583 So.2d at 833 (single mother of three-year-old son who died as a result of being bit by a truck awarded $325,000 by jury, which was reduced by court in JNOV to $150,000); but see Scarbrough v. O.K. Guard Dogs, 03-1243 (La.App. 1st Cir.5/14/04), 879 So.2d 239, 249, writ denied, 04-1440 (La.9/24/04), 882 So.2d 1127 (single mother awarded a total of $897,400 in general damages for her mental anguish for seeing her son at the accident scene and for the wrongful death of her 12-year-old son, who died eleven days after suffering serious injuries when he was hit by a truck's side mirror while walking down a narrow city street).
For these reasons, we will apportion the general damages, awarding $575,000 to Ms. Rideau and $250,000 to Mr. Bardell. After applying the percentages of fault, the judgment will be amended to order the defendants to pay $345,000 to Ms. Rideau and $150,000 to Mr. Bardell.
Court Costs
According to LSA-R.S. 13:4533, the costs of the clerk, sheriff, witness fees, costs of taking depositions, copies of acts used on the trial, and all other costs allowed by the court are to be taxed as costs. Expert witness fees and the costs of medical reports and hospital records are also to be taxed as costs, pursuant to the provisions of LSA-R.S. 13:3666. See Boleware v. City of Bogalusa, 01-1014 (La. App. 1st Cir.12/20/02), 837 So.2d 71, 73-74. The party cast in judgment is generally taxed with costs; however, pursuant to LSA-C.C.P. art.1920, the trial court has discretion to assess costs of a suit in any equitable manner. On appellate review, only a showing of an abuse of discretion warrants reversal of the trial court's cost allocation. Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 362.
After reviewing the facts of this case and the cost items that were taxed to the defendants, we find no abuse of discretion in the trial court's cost allocation. Unlike one of the cases cited to this court by the defendants in which costs were reallocated on appeal, this matter does not involve a squabble between two public entities over documents to be revealed under the Public Records Act. See State ex rel. Guste v. Nicholls College Foundation, 592 So.2d 419, 422 (La.App. 1st Cir.1991), writ denied, 593 So.2d 651 (La.1992). Nor is it a case in which this court merely affirmed a trial court's discretionary decision to allocate costs between plaintiffs and defendants. See Sons v. Delaune, 634 So.2d 1212, 1220-21 (La.App. 1st Cir.1993), writ denied, 94-0729 (La.5/6/94), 637 So.2d 1050. This case involved the untimely death of a beautiful and radiant young girl, due in part to her momentary lapse in judgment at a crucial point in time, but due also to the inattentiveness of a professional truck driver for some period of time during which he could have avoided the accident that killed her. In this situation, we find no abuse of discretion in the trial court's decision to impose the costs of court on the defendants.

CONCLUSION
Based on the foregoing, we amend the judgment of August 17, 2005, to award $575,000 to Judy Rideau and $250,000 to Kerry Bardell. After applying the re-allocated percentages of fault of 40 percent to Bria Bardell and 60 percent to Simuel Ward, we amend the judgment to order the defendants, Ward's Trucking Service, Inc. and State Farm Mutual Automobile Insurance Company, in solido, to pay $345,000 to Ms. Rideau and $150,000 to Mr. Bardell. In all other respects, the *582 judgment is affirmed. Each party is to bear its own costs for this appeal.
AMENDED IN PART AND AFFIRMED AS AMENDED.
GUIDRY, J., agrees in part and concurs in the portion of the opinion that reduces the general damage award.
NOTES
[1] The road is Louisiana Highway 67, also known as Plank Road, and the accident occurred in a mixed rural and residential area south of Clinton and just north of Zachary, in East Baton Rouge Parish.
[2] The petition and answer designate "Ward Trucking Service, Inc." as the name of the defendant, but in the judgment, "Ward's Trucking Service, Inc." is used.
[3] Both parties agree with this factual account and the uncontradicted evidence in the record supports it.
[4] We note that this amount was not correct. The total award for Mr. Bardell was $360,000, and this sum should have been reduced only by the percentage of fault allocated to Bria, which would have resulted in a final award to Mr. Bardell of $288,000.
[5] The plaintiffs did not sue Mr. McCrory and the jury was not asked to quantify any fault on his part. Neither side asserts on appeal that Mr. McCrory was negligent.
[6] Since we find Ms. Rideau had no duty to supervise Bria's attempt to cross the road, we do not address the plaintiffs' alternative claim that Ms. Rideau satisfied whatever duty she had to supervise Bria by asking another adult to ensure Bria crossed the road safely and obtaining his agreement to do so.
[7] This finding was not affected by the error of law, and there is no justification for disregarding the jury's answer to the interrogatory on the verdict form pertaining to Mr. Ward's fault. The manifest error rule is therefore applicable to this portion of the jury's verdict. See Picou, 483 So.2d at 918.
[8] Mr. Sobek said that, depending on his speed, Mr. Ward was between 660 feet to 806 feet away from Bria when she came within his line of sight.
[9] There is no claim for survival damages, which are awarded for the pain and suffering of the victim between the time of injury until the moment of death. There was no evidence in this case that Bria survived the impact for any period of time.